IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

FILED
CHARLOTTE, NC

DEC 1 3 2012

U.S. DISTRICT COURT
WESTERN DISTRICT OF NC

| | |
|---|---|
| UNITED STATES OF AMERICA, and the STATE OF NORTH CAROLINA, ex rel. [UNDER SEAL] | **COMPLAINT** |
| Plaintiffs, | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| v. | Case No.: 3:12cv 825 (RJC) |
| [UNDER SEAL], | |
| Defendant. | ***DO NOT PLACE IN PRESS BOX*** <br> ***DO NOT ENTER ON PACER*** |

**DOCUMENT TO BE KEPT UNDER SEAL**

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| United States of America and State of North Carolina *ex rel*. Diane Matthews,<br><br>                  **Plaintiffs,**<br><br>-vs-<br><br>Horizon Marketing and Research, LLC (aka Horizon MedCorp or Medical Billing Solutions),<br><br>               **Defendant.** | C/A NO.<br><br>**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

## COMPLAINT

(False Claims Act, 31 U.S.C. §§3729-3733)

### PRELIMINARY STATEMENT

This Complaint is based on the knowing submission of false claims by and on behalf of Horizon Marketing and Research, LLC (aka Horizon MedCorp or Medical Billing Solutions) (hereafter "Horizon") to the federal Medicare and joint federal and North Carolina Medicaid programs. Horizon is a Durable Medical Equipment (DME) company that supplies primarily nebulizers, glucose monitors and related supplies to its healthcare provider customers, which in turn prescribe and distribute these supplies to patients. Horizon, rather than the healthcare provider, handles the billing for these supplies to private and government insurers. From at least 2010 through the present, Horizon has knowingly submitted and caused to be submitted claims for reimbursement without appropriate basis, for duplicative services, and without appropriate documentation. Relator owned an external billing company that serviced Horizon and has detailed billing records showing more than two years of fraudulent claims.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. §§ 1331 and 1345, and specific false claims jurisdiction pursuant to 31 U.S.C. § 3732(a).

2.      Claims on behalf of the State of North Carolina Medicaid program are brought pursuant to the North Carolina False Claims Act, N.C. Gen. Stat. § 1-607. Jurisdiction over those state law claims exists under the federal False Claims Act, 31 USC § 3732(b).

3.      Relator Diane Matthews (the "Relator") is a citizen of the United States of America and the State of North Carolina, and is suing in the name of and on behalf of the United States of America and the State of North Carolina. Prior to filing this complaint, Relator informed the government that from approximately 2009 to the present time, Horizon has engaged in a widespread and blatant series of fraudulent billings to the federal and state healthcare programs.

4.      The alleged acts occurred in North Carolina, including in the Western District of North Carolina. Horizon is a corporation organized and existing under the laws of the State of North Carolina.

5.      Accordingly, venue in this district is proper pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a). The physical address of Horizon is 301 N. Main St., Suite 2308, Winston-Salem, NC 27101.

6.      Under the provisions of 31 U.S.C. § 3730(b)(2), the Relator's Complaint is being filed *in camera* and under seal and is not being served on the Defendant.

7.      As required by 31 U.S.C. § 3730(a)(2), Relator provided material evidence and information related to this Complaint to the Attorney General of the United States and the United States Attorney for the Western District of North Carolina prior to the filing of this Complaint.

8.     As required by N.C. Gen. Stat. § 1-607(b)(2), Relator provided material evidence and information related to this Complaint to the Attorney General of North Carolina, prior to the filing of this Complaint.

## Factual Background

9.     From at least 2009 through the present, Horizon has engaged in a scheme of excessive and fraudulent billing such that anywhere from a significant percent to the totality of the claims reflected on any given electronic remittance received by Horizon from government payors were false and fraudulent.

10.     Horizon's knowingly fraudulent billing practices were observed by Relator and her company, eMedical Billing Solutions (hereafter "eMedical"), when eMedical entered into a contractual arrangement to take over billing services for Horizon concurrent with the discharge of a prior billing service in about April 2010. The contractual relationship between eMedical and Horizon lasted less than three months, because eMedical refused to continue the fraudulent billing practices that Horizon had implemented through its prior billing company. On June 30, 2010, Horizon terminated eMedical's services effective in 30 days.

11.     Horizon Marketing and Research, Inc. ("Horizon") is a privately held North Carolina corporation formed in 2000. Douglas M. Cruitt is the registered agent and is presently the president of Horizon. At the time the corporation was formed in 2000, Stanley Cruitt was the president. Stanley Cruitt is Douglas Cruitt's uncle. Peter Beemstroerboer is the CEO and majority shareholder of Horizon. He purchased a majority interest from Stanley Cruitt in the mid-2000's. Peter Beemstroerboer is related to Douglas M. Cruitt by marriage, as an uncle. Stanley Cruitt and Doug Cruitt own a minority interest in Horizon.

- 3 -

12.     Grande Peaks Technologies, Inc. is a private North Carolina corporation having Stanley Cruitt as its registered agent and president.  Grande Peaks Technologies, Inc. recruits DME suppliers throughout the United States and acts as a centralized distributor of products. Grande Peaks Technologies charges a fee to the DME's that come under contract.

13.     Horizon is a DME company that services clinics and other healthcare providers. Up until sometime in 2010, Horizon's business was conducted primarily throughout North Carolina.  As described below, Horizon began to expand its business into other states when it started to provide diabetes supplies and equipment.

14.     Horizon is a licensed DME provider under the government healthcare programs. Horizon stocks its DME supplies (primarily nebulizer equipment and diabetes supplies) in the offices of its customers – physician's offices, clinics, etc.   The healthcare provider then prescribes and distributes the supplies to patients, as needed.  Horizon does the billing services for supplies distributed by Horizon's customers.  The submission by Defendant to said federal and State payer programs for payment or reimbursement involves a representation and certification the Defendant will abide by and has abided by and that it will adhere to and has adhered to all of the statutes, rules, and regulations governing the payer programs.

15.     Horizon claims to provide respiratory equipment to approximately 150 provider sites in North Carolina.  One such clinic in the Western District of North Carolina is Wilkes Pediatrics Clinic, 1925 West Park Drive, North Wilkesboro, NC 28659.

16.     Horizon stocks the clinics with respiratory equipment at no charge to the provider, which allows the provider to prescribe the equipment to patients, educate them on use of the equipment and send them home with equipment in hand.  Horizon's nebulizer equipment is targeted at healthcare providers with substantial Medicaid patient populations.

- 4 -

17.     The healthcare providers are required to provide Horizon with information regarding the patient, the diagnosis that supports the equipment prescribed, the patient's insurance or entitlement to government benefits, and the prescriber's signature stating that the equipment provided was medically necessary. Horizon then handles the billing and customer service for those supplies, submitting claims for reimbursement to government or private payors depending on the patient's insurance status.

18.     When eMedical started work on its contract with Horizon, eMedical immediately noticed generally sloppy billing records and totally inadequate tracking of submitted claims with actual payments. Further, it became almost immediately apparent that the prior biller, under the direction and with full acquiescence of Horizon and Stanley Cruitt of Grande Peaks, had been submitting numerous claims for reimbursement despite the failure to have signed Certificates of Medical Necessity ("CMNs") for the DME supplies that had been provided to the patients. Additionally, Horizon and the prior billing company had frequently submitted duplicative claims for the same supplies.

19.     Upon information and belief, Stan Cruitt was responsible for setting up the arrangements between Horizon and its prior billing company in Arizona. This belief is based on comments made by Stan Cruitt to Relator and on Cruitt's representation in an email dated May 17, 2010, that he was responsible for convincing Horizon to switch from the prior biller to eMedical.

### Claims to North Carolina Medicaid

20.     Horizon's DME business supplied nebulizers and related respiratory supplies to healthcare providers throughout the State of North Carolina. Horizon's DME was dispensed to many North Carolina Medicaid beneficiaries and reimbursement was sought from the Medicaid

- 5 -

program. Medicaid is a joint federal and state program, funded by both the federal and state governments, with administration of the program managed by the State.

21. Reimbursement for durable medical equipment (DME) under North Carolina Medicaid is governed by the North Carolina Division of Medical Assistance Clinical Coverage Policy No.: 5A, Durable Medical Equipment and Supplies ("Clinical Coverage Policy" or "CCP").

22. Pursuant to Section 3.1 of the CCP, medical equipment and supplies are covered when an item is "medically necessary." The "medical need must be verified by the recipient's physician, physician assistant or nurse practitioner [MD, PA or NP]."

23. Under Chapter 5 of the CCP, entitled "Requirements for and Limitations on Coverage," "[m]edical necessity must be documented by the MD, PA, NP for every item provided/billed regardless of any requirements for [prior or specific] approval." This is accomplished through a Certificate of Medical Necessity/Prior Approval ("CMN/PA" or just "CMN"). The CMN must be completed and signed by the MD, PA or NP.

24. Attachment B to the CCP, entitled "Completing the Certificate of Medical Necessity/Prior Approval Form," itemizes the information required, including beneficiary identification information, provider identification information, principal diagnosis, and signature of the physician, PA or NP "to verify the accuracy of the information on the form [and] the medical necessity for the requested item(s)."

25. A DME provider, such as Horizon, is required to maintain various documentation of the services for which it billed Medicaid, including the prescription for the item signed by the physician, PA or NP; the original CMN/PA form; a full description of all equipment provided to the patient; and certain delivery information. CCP, Sec 7.2.

- 6 -

26.     The DME provider is also required, pursuant to Section 7.3, to determine what other services the Medicaid recipient is receiving and for "coordinating care to ensure there is no duplication of service." CCP, Sec. 7.3.

## Claims to Medicare

27.     Although many of Horizon's nebulizer claims were submitted to North Carolina Medicaid, the majority of the diabetes supplies were provided to Medicare recipients and claims were submitted to Medicare.

28.     Horizon was keenly aware that the bulk of its revenues were expected to come from Medicare.  As Horizon CEO Peter Beemsterboer put it when questioning the amount of payments being received, "[t]he main question is how much medicare diabetes has been billed and when."  In a similar vein, Stan Cruitt wrote that distributing diabetes supplies "is far sweeter than respiratory."

29.     The diabetes supplies that Horizon billed for included glucose monitors and related supplies.

30.     The United States Department of Health and Human Services (hereinafter "HHS"), acting by and through the Centers for Medicare and Medicaid (hereinafter "CMS"), is an agency of the United States of America responsible for administering the federal Medicare Programs, *see* 42 U.S.C. § 1395, *et seq.*, under which healthcare facilities and providers may be reimbursed with federal funds for services provided to eligible patients or Medicare beneficiaries.

31.     Horizon's DME business operated within Jurisdiction C of the DME Medicare Administrative Contract ("DME MAC").

- 7 -

32.     The submission of a claim form and information contained therein is an essential element in the Medicare claims process. It requires a DME company to certify the following:

> This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

33.     Prior to submitting a claim for reimbursement for glucose monitors and supplies, the biller is required to have a Detailed Written Order that includes the beneficiary's name, a list of all separately billed items dispensed, the number of items to dispense, the refill frequency, the frequency of testing to be performed by the patient, and the treating physician's written signature with the date.

34.     Upon request, the biller must also furnish medical records documenting medical necessity for the monitor and supplies and specific information justifying any quantities above the normal allowances specified. If the patient regularly uses quantities of supplies that exceed the normal allowance, new documentation must be presented at least every six months.

35.     DME companies are required to get and maintain proof of equipment delivery documentation in their files when equipment is being directly delivered to the beneficiary. This includes the signature of the patient or the patient's designee. *CMS Manual System, Pub. 100-08, Medicare Program Integrity Manual, Chapter 4, §4.26.*

36.     In order to bill for refills of supplies, such as glucose monitor testing strips, the biller is required to have a specific request for a refill of those supplies. This can be in writing or through a verbal communication that is documented in writing by the supplier. Thus a "beneficiary or their caregiver *must* specifically request refills of glucose monitor supplies *before* they are dispensed. The supplier cannot automatically dispense a quantity of supplies on a predetermined regular basis, even if the beneficiary has 'authorized' this in advance."

- 8 -

www.cgsmedicare.com/jc/pubs/news/2008/0308/cope7300_1_html (accessed Sept. 2012) (emphasis in original).

## Horizon's Fraudulent Billing Practices

37.    Within a few weeks of beginning to work as Horizon's biller in April, 2010, Relator and other eMedical personnel began to observe many irregularities in the billing, including CMNs that were not properly completed or signed, and claims that were submitted for reimbursement despite having already been paid.

38.    When the issue of missing or incomplete documentation was first raised with Horizon by eMedical, senior management personnel of Horizon -- including Peter Beemsterboer, Stanley Cruitt and Doug Cruitt -- acknowledged that Certificates of Medical Necessity were required, acknowledged that Horizon typically had not actually obtained such CMNs, and attempted to persuade eMedical to simply bill without the required CMN with a promise that Horizon would get the paperwork in order after submitting the claim.

39.    At one point early in the relationship, when Relator cautioned Horizon CEO Peter Beemsterboer that Horizon could face liability and penalties for submitting claims without proper CMNs, Beemsterboer told Relator that he was aware of this problem and had discussed it with Horizon's counsel, but had decided that they could take the chance that they would not be caught.

40.    In a video conference call on May 28, 2010, eMedical discussed incomplete CMNs that Horizon had submitted to eMedical for billing. Out of 379 respiratory CMNs that Horizon had provided to eMedical for the first half of May, 2010, eMedical returned 30% to Horizon because they were deficient in some way. 225 of these 379 claims that Horizon expected eMedical to submit were for Medicaid reimbursement.

41.     For diabetes supplies, Horizon typically used a form that resembled or was labeled a Certificate of Medical Necessity as the required Detailed Written Order. Out of 144 diabetes forms that Horizon provided to eMedical for billing, including 127 Medicare patients, eMedical was forced to reject every single one, mostly because the forms lacked physician signatures, didn't have patient signatures confirming delivery, or were duplicates. By email dated June 5, 2010, eMedical informed Horizon that there were numerous errors on CMNs that Horizon had provided to eMedical for billing purposes. Out of 144 CMNs for diabetes supplies, for example, 81 had no patient signatures confirming delivery, 55 had no physician signatures and 23 were duplicates.

42.     In internal discussions following that electronic meeting, eMedical personnel discussed the possibility of submitting claims for only the first 30 days of supplies in instances where the forms were not complete, allowing Horizon to finalize the paperwork during that time period. eMedical discussed having Horizon provide eMedical with a written "hold harmless" agreement whereby Horizon would be responsible for any penalties that resulted from these practices.

43.     Ultimately, however, eMedical determined that the submission of claims with knowledge that there was not a completed CMN would constitute Medicare and Medicaid fraud, and eMedical informed Horizon that it would not submit claims under those circumstances.

44.     Shortly after that electronic meeting, Relator documented the instructions given by Horizon for eMedical to handle its billing. Relator emailed her business partner, Michael Simeone, that eMedical was "advised on the meeting we had LAST WEEK with Horizon that they wanted us to bill for Medicaid/Medicare Diabetes even if we didn't have a patient or doctor signature on the CMN. Technically, this is Medicaid/Medicare fraud."

- 10 -

45.    In an email dated June 5, 2010, eMedical principal Michael Simeone also documented the process that Horizon management Doug Cruitt and Peter Beemsterboer had instructed eMedical to follow with regard to incomplete CMNs.    Simeone documented the following specific instructions that were conveyed during the May 28 conference:

- "Go ahead and file the CMN as a billing to Medicaid/Medicare using the 30-day supply shipment.

- Ship to the patient the 30-day supply with an AOB (Assignment of Benefits) form in the packing material for the patient in an effort to obtain the patient's signature on an AOB form.  This would be done by Horizon's staff.

- If patient does not return the AOB form, Horizon will follow up with patient with phone call.

- If physician does not sign the CMN form, Horizon will follow up with physician office to get a verbal and the SuiteMed software allows for notations with dates and time for patient record documentation together with auto reminders to follow up to ensure that the signature of physician is ultimately received."

46.    Simeone informed Horizon management in this email that "this method of billing would not be considered ethical since we do not have a completed CMN in hand before billing is claimed."  Additionally, Simeone attached documentation from CMS showing the proper billing regulations.  Finally, in the same email, Simeone informed Horizon that "eMedical Billing Solutions cannot accommodate Horizon MedCorp's request to file with any insurance carrier a CMN that is missing required information before billing is submitted to the carrier knowing that such information is missing at the time of billing."

- 11 -

47.     Based on the unabashed acknowledgement by Horizon's CEO that the company had *no* CMNs on file for the period prior to eMedical's involvement, as well as the fact that Horizon was unable to produce a single CMN to eMedical when requested to provide just a sample, all of the Medicaid billings for 2009 and the first half of 2010 were false.

48.     When eMedical billers refused to submit claims without the required CMNs, Horizon agreed to obtain them, but instead started submitting forged, incomplete, unsigned and otherwise defective CMNs to eMedical for billing purposes. Relator and some of her employees observed instances where the returned CMNs had noticeably different versions of the same doctor's ostensible signature and also instances where the wrong provider NPI (National Provider Identification) was listed. Since that number is used commonly by providers, it seemed very suspicious that a doctor would have actually signed a CMN but listed an incorrect NPI for him or herself.

49.     During the several months that eMedical was attempting to do the billing for Horizon and thereafter, Relator observed numerous instances where the prior biller had submitted duplicate claims for the same supplies, some of which had been reimbursed at least twice by Medicaid or Medicare.

50.     Exhibit A is a spreadsheet showing duplicative payments for claims that the prior biller had billed twice or that eMedical had billed once and then the Arizona biller re-billed and received a duplicative payment. These duplicative claims are identified by patient number, date of service, date of payment, check number where the duplicative payment was included, and the CPT code. Exhibit A also identifies incidents where there was double-billing, but the claim was not, in fact, paid twice, as well as incidents where claims had been billed without adequate CMNs.

51.     During the several months that eMedical was attempting to do the billing for Horizon, Horizon senior management complained that eMedical was not producing the same revenues in the form of reimbursement that the prior biller had produced.  More specifically, when eMedical was terminated effective June 30, 2010, Horizon senior management told eMedical that Horizon was disappointed and angry because eMedical hadn't been able to pull in "$20,000 per week in billings, like the old biller."  It was readily apparent to Relator and her staff that the primary reason for the decline in revenues was that the prior biller had submitted claims for reimbursement without proper documentation and often for duplicative claims.

52.     During the contentious three months that eMedical and Horizon had the contractual relationship, Horizon had a so-called "auditor," known to Relator only as Fran, who tried to persuade eMedical that it was accepted practice in the DME industry to bill for supplies without actually having CMNs in hand, or with CMNs that were missing required physician or patient signatures, diagnosis codes, or itemization of the supplies ordered.  Fran informed Relator that Horizon's prior biller "just sent them through."  Doug Cruitt, Stan Cruitt and Pete Beemsterboer participated in this conversation and urged eMedical to just submit the inadequately documented claims.

53.     Near the end of eMedical's relationship with Horizon, by email dated June 11, 2010, Michael Simeone communicated again with Doug Cruitt and Peter Beemsterboer of Horizon regarding improper CMNs.  Simeone itemized the nature of the errors on CMNs that Horizon had provided to eMedical for billing purposes.  Of the 15 CMNs that Simeone was discussing, three had no diagnosis, one had an invalid Medicare ID number, one had an invalid Ohio address, two were duplicates, and five had no physician signature.  The three CMNs that were properly filled out were submitted for payment.

- 13 -

54.     At or shortly after the time that Horizon had engaged eMedical to provide billing services, Horizon also had an arrangement with a billing agent in New York to bill diabetes supply claims that eMedical refused to submit.  Consistent with eMedical's understanding of proper billing procedures, most of the claims submitted by this biller were denied by Medicare.

55.     Relator is also aware that Horizon has engaged in totally fraudulent, bogus billing for medical supplies, over and above the numerous instances where claims were submitted without proper documentation or in duplicate.  For example, in May 2010, Horizon requested that eMedical send bills to patients to collect deductibles, copays or declined insurance reimbursements.  eMedical mailed out 114 bills to patients identified by Horizon as having received various nebulizer supplies.

56.     Within a few days of this mailing, eMedical was informed that Horizon's switchboard had "lit up" with irate calls from ostensible patients stating that they had never received the equipment for which they had just been billed by Horizon.  Some people claimed not to have been patients for some time, others that they never received any equipment, others that they had not received what they had just been billed for.

57.     In addition to billing services that are provided by eMedical, Relator operates another company that provides sophisticated electronic health record (EHR) services, selling a product called SuiteMed.  During the period while eMedical was handling billing operations for Horizon, Relator and her other entities were also establishing various EHR capabilities for Horizon.  Through these systems, Relator was able to observe the total amount of supplies that Horizon was distributing to its various healthcare provider locations (physician's offices, clinics, etc).  Relator observed that the total dollar value of supplies provided by Horizon to its customers was not as much as the claims billed for their patients by Horizon for the same time

- 14 -

period. Since Horizon was the exclusive supplier for the supplies at issue, this provided further evidence that Horizon was billing for supplies that had not, in fact, been distributed to patients.

58. Exhibit B is an analysis conducted by eMedical of the total shipments by Horizon to its customers and the total billings submitted by Horizon on behalf of those customers. Relator's analysis demonstrated that the total value of respiratory supplies distributed by Horizon to its customers during a trial period in 2009 averaged $16,856, but Horizon claimed to submit approximately $20,000 per week in reimbursement claims. This suggests overbilling of approximately 20% during the period tested.

59. There were repeated instances where diabetes supplies were shipped to supposed patients, and billed to government or other insurers, but the supplies were returned with a notation that the patient had died. On some occasions this was reported as a recent death, but other times the patient had been dead for some time. Relator has observed EOBs sent by Medicare to the New York billing agent that Horizon used, showing claims rejected because patients were deceased.

60. On other occasions, patients received notification of a payment having been made by Medicare or another insurer for diabetes supplies, but the patient contacted Horizon and reported that no such supplies had been shipped.

61. For much of the relevant time period, Horizon's business practice with regard to the diabetes supplies was to have the field salesperson submit a written order for supplies to Horizon. Very often, this paper form did not contain a physician's signature, despite the Medicare requirements. Horizon routinely submitted claims to Medicare for diabetes supplies despite not having a signed written order for those supplies.

- 15 -

62.     Additionally, notwithstanding the Medicare requirements to have an express patient request for additional supplies, Horizon's business practice when it entered the diabetes market was to automatically ship refills of supplies every three months to any patient in its database.   These shipments were then billed to Medicare, in violation of the refill requirements. All or virtually all of the refill claims billed through Horizon under this system constitute false claims.

63.     Upon information and belief, Horizon shipped glucometers that were not approved brands under Medicare reimbursement regulations, yet Horizon billed Medicare for reimbursement.  Horizon's use of an unapproved brand of glucometer was driven by the fact that a related company in which the Horizon principals were involved hoped to market a remote monitoring system for use with glucometers, but that system would not work with the approved brand.

64.     Shortly after the contract with eMedical was terminated effective June 30, 2010, one of the eMedical billers communicated with Relator that she had seen duplicative claims that had been previously paid submitted again by Horizon's reinstated biller.  Some of these involved same dates of service, but different charge amounts.  Relator has identified these duplicative claims by patient number and check number, on Exhibit A.   Although a significant number of the duplicative claims were denied by the government payor, those submissions still constitute false claims to the government, for which penalties can be assessed.  Moreover, many of the duplicate claims that were billed were, in fact, paid twice or even three times.  For example, in a check Medicaid sent to Horizon on August 3, 2010 (Medicaid Check # 004322319),  Relator identified 441 incidents of double billing and two instances of triple billing.  Because Medicaid caught some of the double bill claims, it only ended up paying Horizon $2,066 in duplicate

payments, which consists of 129 instances of double payment. Since the total check was for $21,687.25, ten percent of the check Medicaid paid to Horizon was for duplicate submissions that should not have peen paid.

65.     Additionally, Relator performed a random sample analysis of Explanation of Benefits (EOB) which is in essence the remittance advice of a Medicaid check, and found that many of the large checks contained at least 10% duplicate payments. When Relator performed a detailed examination of a set of checks in a sample period of time, she found that the frequency of double-billing (of which only some claims were, in fact, paid twice) was over 40%. See Ex. C.

66.     Prior to the contract with eMedical, billing for Horizon had been handled by Cheryl Salmon, of CPR Medical Billing, a solo billing agent in Arizona. Although Horizon initially told eMedical that Horizon was terminating its relationship with Salmon because she could not handle the anticipated volume of work going forward, Horizon renewed its billing arrangements with Salmon once it became clear that eMedical would not bill in the same fraudulent manner.

67.     Shortly after Horizon returned to having Salmon handle the billing function, Horizon CEO Peter Beensterboer informed Relator and eMedical that Horizon would pay its past due invoices to eMedical "as quickly as [he] can restore Horizon's cash flow."

68.     Beemsterboer informed eMedical in or about mid-July that Horizon could finally pay its overdue payables to eMedical because Horizon had improved its cash flow. Relator understood that to have occurred as a result of the resumption of fraudulent and duplicative billing practices.

- 17 -

69.     With her access to the information on the clearinghouse, Relator confirmed that Salmon had, indeed, submitted claims to government payors for items already billed by Horizon. Additionally, Relator observed billings for old dates of service despite Salmon having sworn that she was up to date with billings at the time eMedical took over in April 2010. For example, there should not have been any claims with 2009 dates of service if the prior biller had been up to date with billings in early 2010. Finally, Relator documented instances where suspicious dates of service or claimed amounts suggested that duplicative billings were being created.

70.     Horizon's conduct was a deliberate effort to collect illegitimate reimbursements from the government healthcare programs. Double-billing and billing without proper documentation by Horizon and its billing companies were essential elements of Horizon's operational strategy. This fraudulent billing recurred virtually immediately upon reinstatement of the prior billing company, even after eMedical had repeatedly notified Horizon of the problem. Additionally, Horizon utilized a billing company in New York to bill for diabetes supplies that eMedical had explained were not legitimate, demonstrating that Horizon, at a minimum, was reckless or deliberately indifferent to the improper and double billing. Therefore, even when the government did not actually pay a given claim twice, Horizon is still liable for a penalty for each claim that was double-billed.

**FIRST CAUSE OF ACTION**
**VIOLATION OF FALSE CLAIMS ACT**
**31 U.S.C. § 3729(a)(1)(A)**
**(PRESENTATION OF FALSE OR FRAUDULENT CLAIMS**
**FOR APPROVAL OR PAYMENT)**

71.     Plaintiff incorporates by reference Paragraphs 1 - 70, as if fully set forth herein.

72.     The United States of America has been damaged as a result of the violation of the False Claims Act by Horizon, and the government is entitled to be reimbursed for monies

- 18 -

obtained by Horizon and for the amount of money by which it has over-compensated Horizon for fraudulent claims Horizon presented or caused to be presented for payment or approval to the United States of America, plus all applicable fines and civil penalties.

73.     The United States is entitled to treble damages based upon the amount of damages sustained by the United States as a result of violations of 31 U.S.C. § 3729(a)(1) by Defendant.

74.     The United States is entitled to a civil penalty between $5,500.00 and $11,000.00 as required by 31 U.S.C. § 3729(a)(1) for each fraudulent claim of Defendant.

75.     Relator is entitled to reasonable attorney's fees and costs, pursuant to 31 U.S.C. § 3730(d), as well as an amount between 15% and 25% of the United States' recovery.

**SECOND CAUSE OF ACTION**
**31 U.S.C. § 3729(a)(1)(B)**
**(USE OF FALSE RECORDS OR STATEMENTS MATERIAL TO A FALSE CLAIM)**

76.     The allegations of Paragraphs 1 - 70 are incorporated as if set forth herein verbatim.

77.     Relator alleges that in performing the acts herein before set forth, Horizon knowingly made, used, or caused to be made or used false records or statements to get false or fraudulent claims paid or approved by the government to the damage of the United States of America in violation of 31 U.S.C. § 3729(a)(1)(B).

78.     These fraudulent statements and records were material to the false claims Defendant coincidently or subsequently filed with the federal payer programs. As a result, Defendant knowingly presented or caused to be presented false records and/or statements to an officer or employee of the United States of America, material to subsequently paid false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(B).

- 19 -

79.    Through Defendant's use of falsified records or statements, the United States of America has been damaged as a result of violation of the False Claims Act and is entitled to be reimbursed for monies obtained by Defendant for fraudulent claims it presented or caused to be presented for payment or approval.

80.    The United States is entitled to treble damages based upon the amount of damages sustained by the United States of America as a result of the usage of false records or statements by Horizon.

81.    The United States is entitled to a civil penalty between $5,500 and $11,000 as required by 31 U.S.C. § 3729(a)(2) for each use of fraudulent records and/or statements by Defendant.

82.    Relator is also entitled to reasonable attorneys' fees and costs, pursuant to 31 U.S.C. § 3730(d), as well as a percentage between 15% and 25% of the United States' recovery.

### THIRD CAUSE OF ACTION
### 31 U.S.C. §3729(a)(1)(C)
### (CONSPIRACY TO MAKE FALSE CLAIMS AND UTILIZE MATERIALLY FALSE STATEMENTS AND/OR RECORDS)

83.    The allegations of Paragraphs 1 - 70 are incorporated as if set forth herein verbatim.

84.    Plaintiff alleges that in performing the acts set forth above, Defendant Horizon conspired with Stanley Cruitt and Grande Peaks, who knowingly made, used, or caused to be made or used materially false records or statements, subsequently submitting or causing to be submitted fraudulent and/or false claims with the federal payer programs, to get false or fraudulent claims paid or approved by the government to the damage of the United States of

America in violation of 31 U.S.C. § 3729(a)(1)(C). As a result, Horizon, as a co-conspirator, has violated 31 U.S.C. § 3729(a)(1)(C).

85.    The United States of America has been damaged as a result of the Defendant's and the un-named co-conspirators' conspiracy and violation of the False Claims Act by Horizon. The United States is entitled to treble damages based upon the amount of damages sustained by the United States of America as a result of violations of law by Defendant Horizon.

86.    The United States is entitled to a civil penalty between $5,500 and $11,000 as required by 31 U.S.C. § 3729(a)(3) for each fraudulent claim of Defendant Horizon.

87.    Relator is entitled to reasonable attorney's fees and costs, pursuant to 31 U.S.C. § 3730(d), as well as an amount between 15% and 25% of the United States' recovery.

### FOURTH CAUSE OF ACTION
### UNDER NORTH CAROLINA FALSE CLAIMS ACT
### N.C. Gen. Stat. §1-607

88.    Relator realleges and incorporates the foregoing allegations as if fully set forth herein.

89.    Relator asserts claims under N.C. Gen. Stat. § 1-607, which provides liability for any person who:

- Knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

- Knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim;

- Conspires to commit a violation of [certain] subdivisions of this section [including the above].

- 21 -

90. By submitting and causing to be submitted false claims to North Carolina's Medicaid program, as alleged above, Horizon violated N.C. Gen. Stat. § 1-607 from at least 2009 to the present.

91. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to N.C. Gen. Stat. § 1-608(b) on behalf of herself and the State of North Carolina.

92. The State of North Carolina is entitled to damages and statutory penalties as provided by the North Carolina False Claims Act.

93. Relator is entitled to attorneys' fees and costs, and a share of the recovery of the State of North Carolina, as provided by the North Carolina False Claims Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Relator demands judgment against Defendant as follows:

(a) That, by reason of the violations of the federal False Claims Act as set out in the above causes of action, this Court enter judgment against Horizon Medical, in an amount equal to three times the amount of damages the United States of America has sustained because of defendant's actions, plus a civil penalty of not less than Five Thousand Five Hundred Dollars ($5,500) and not more than Eleven Thousand Dollars ($11,000) for each violation pursuant to 31 U.S.C. § 3729(a);

(b) That Relator, as Qui Tam Plaintiff, be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act and any other applicable provision of law;

- 22 -

(c)     That Relator be awarded an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs;

(d)     That the United States of America and Relator have such other relief as the Court deems just, proper and in the interest of substantial justice;

(e)     That, by reason of the violations of the North Carolina False Claims Act, this Court award judgment against Horizon in an amount equal to three times the amount of actual damages which the State of North Carolina has sustained as a result of Horizon's fraudulent and illegal acts, and penalties in the amount of not less than $5,500 and not more than $11,000 for each false claim that Horizon submitted, caused to be submitted or conspired to submit to the State of North Carolina;

(f)     That Relator, as Qui Tam Plaintiff, be awarded the maximum amount allowed pursuant to the North Carolina False Claims Act, N.C. Gen. Stat. § 1-610 and any other applicable provision of law;

(g)     That Relator be awarded  an amount for reasonable expenses that the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs;  and

(h)     That the State of North Carolina and Relator have such other relief as the Court deems just, proper and in the interest of substantial justice.

Dated:  December 11, 2012                    **RABON LAW FIRM**, PLLC

Charles H. Rabon, Jr.
1616 Cleveland Avenue
Charlotte, North Carolina 28203
Telephone: 704-375-1800
Facsimile: 704-347-0684

**BERGER & MONTAGUE, P.C.**

Sherrie R. Savett, PA Bar No. 17646
Susan Schneider Thomas, PA Bar No. 32799
Yael R. May, PA Bar No. 307027
1622 Locust Street
Philadelphia, PA  19103-6305
Telephone: (215) 875-3000
Facsimile: (215) 875-4604

- 24 -